

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-16-463

| | |
|---|---|
| | **Opinion Delivered** September 28, 2016 |
| TOMEKO SHARKS<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, TENTH DIVISION<br>[NO. 60JN2014-1660]<br><br>HONORABLE JOYCE WILLIAMS WARREN, JUDGE<br><br>AFFIRMED |

**BRANDON J. HARRISON, Judge**

Tomeko Sharks appeals the Pulaski County Circuit Court's decision to terminate his parental rights to his child, one-year-old D.S. He argues that terminating his parental rights was not in D.S.'s best interest and that the Arkansas Department of Human Services (DHS) failed to prove a statutory ground to support the termination. We affirm the circuit court's decision.

## I. *Case History*

In December 2014, DHS took emergency custody of D.S. after someone had reported that Sharks was swinging four-month-old D.S. in a threatening manner at the Pulaski County Courthouse. Police officers arrested Sharks for public intoxication after observing him behave erratically and telling them he would kill D.S. and D.S.'s mother if he had to. The circuit court adjudicated D.S. dependent-neglected in February 2015. The court found D.S.'s putative father Tomeko Sharks's "use of alcohol with his prescription

SLIP OPINION

medication . . . make him an unfit parent." The court then ordered Sharks, among other things, to

1.      Cooperate with DHS

2.      Undergo a psychological evaluation if he hadn't undergone one within the previous six months

3.      Attend and participate in individual counseling and follow all recommendations

4.      Take medication as prescribed

5.      Refrain from illegal drug and alcohol use

6.      Undergo a drug-and-alcohol assessment

7.      Submit to random drug screens

8.      Complete parenting classes

9.      Obtain and maintain stable employment or income

10.      Maintain safe, stable housing

The court also appointed Sharks a guardian ad litem after he "displayed behavior that concerned the Court." Because of this behavior, the court ordered Sharks to undergo a drug screen, which was positive for amphetamines. Sharks refused the alcohol portion of the drug test.

A review order was entered June 2015. There, the court wrote,

Putative father [Sharks] has minimally complied with the case plan and court orders. Specifically, he cancelled his psychological evaluation. He attended one parenting class and was dropped from those classes for non-attendance. He has not submitted to random drug screens when requested by DHS. He had the drug and alcohol assessment. He was positive for benzodiazepines on one screen, but has a prescription to account for that positive screen. He was positive for alcohol on one drug screen. He was arrested several times since the last hearing—two times for public intoxication.

He has visited the juvenile six (6) of the ten (10) scheduled visits. He appeared at one of the visits under the influence, but he was allowed to visit, as he was not inappropriate. No information has been presented, other than his testimony, that he is attending individual counseling or substance abuse treatment. He is evasive and not truthful. He has not cooperated with DHS as far as signing release for V.A. information. He has made no progress towards alleviating or mitigating the causes of the juvenile(s)' removal from the home.

In its September 2015 permanency-planning order, the court found Sharks to be D.S.'s legal father based on DNA evidence and appointed an attorney to represent him. The court also noted that Sharks "has been incarcerated in Pulaski County Jail since August 16 and expects to be released October 16." While the court noted that Sharks's visits with D.S. were "very appropriate," it also stated that Sharks "did not attend all of the visits before his incarceration, and has missed more visits than he attended." Sharks had not submitted to random drug screens as ordered or provided a release for DHS to obtain his medical records from the Veterans Affairs. The order states, "The court believes [Sharks] has been in individual counseling and substance abuse treatment at the V.A.; but, there is no documentation to support that claim nor to demonstrate the progress made in treatment."

DHS petitioned for termination of parental rights in October 2015. The petition alleged that terminating Sharks's parental rights was in D.S.'s best interest and that two statutory grounds for termination existed under Arkansas Code Annotated sections 9-27-341(b)(3)(B)(vii)(*a*) (Repl. 2015) (other-factors-arising ground) and 9-27-341(b)(3)(B)(ix)(*a*)(3)(B)(i) (aggravated-circumstances ground). Sharks was not satisfied with his appointed attorney, so the circuit court granted Sharks's request for a continuance and appointed him a different one.



## II. *The Termination Order*

The court held a termination hearing in January 2016 and entered a final order terminating Sharks's parental rights in February 2016. The termination order, in part, states,

> After the filing of the original dependency-neglect petition, other factors or issues arose which demonstrate that placement of the juvenile in the custody of the father is contrary to the juvenile's health, safety or welfare. This case has been open for over a year, and Mr. Sharks just started completing services a couple of weeks ago, well after the October 15, 2015 date of the filing of the Petition for Termination of Parental Rights. He failed to complete the parenting classes to which he was referred, and was dropped for missing two (2) classes. He continued not to provide his medical records from the V.A., and only provided a release to obtain his medical records two (2) weeks ago. Three (3) referrals had to be made for father for a psychological evaluation, and two (2) referrals for a drug and alcohol assessment. The Court finds Jessica Warren's testimony to be very credible. Ms. Warren testified, today, that the parents have made a game of whether they will complete services, and are not interested in participating in the services to remedy the cause of the juvenile's removal. On December 22, 2015, Mr. Sharks told Ms. Warren that the juvenile's mother had stabbed him in the leg, and that they have a violent relationship. Subsequently, Ms. Warren and a DHS Supervisor talked to mother about severing her relationship with Mr. Sharks, and the mother did not seem to see the issues that would place the juvenile at risk if she remains in a relationship with Mr. Sharks. Mr. Sharks did not complete his psychological evaluation until January 18, 2016, and only completed his drug and alcohol assessment on January 25, 2016. He has only attended twenty one (21) of fifty five (55) scheduled visits with this juvenile since the case began on December 12, 2014. This week, he presented Ms. Warren with proof of completion of the Centers for Youth and Families parenting class he attended. He did not submit to all of the requested drug screens, as court ordered. He submitted a certificate of participation for completion of the 28-day intensive outpatient substance abuse program at the V.A. Today, Mr. Sharks testified that he is not an alcoholic, and that he has learned his triggers to think he can drink a beer. Mr. Sharks talks a good game, but he does not follow through in any timely or consistent manner with the things that have been put in place by DHS and this Court to enable him to be a fit and proper parent with whom this child can be placed, in the event the mother was not able to become a fit and proper parent. The Court finds Mr. Sharks very credible regarding his testimony today that his [ ] disease, his disk problems, his hypertension, and his PTSD did not cause him to not participate in services.

The Court finds Mr. Sharks has ongoing issues related to his mental health diagnosis of PTSD and his alcohol abuse, and those require consistent long-term treatment. Mr. Sharks is not viewing this case or the juvenile's needs from a realistic perspective, especially when he testified that, although he currently does not have stable housing for the juvenile, he has a sister and brother in town, and they will open up their house immediately. The Court finds Mr. Sharks not credible in his testimony that he did not know he had to work this hard from the beginning, and he was not aware that he was supposed to participate in the case plan until he was released from his incarceration on October 16, 2015. The Court finds Mr. Sharks to be manipulative, and untruthful, as the Court has made painstaking efforts, every step of the way, to explain to him and the juvenile's mother, what was happening in the case at each hearing, what was required to enable the juvenile returned to the legal custody of mother or, in the alternative, for the juvenile to be placed in the permanent legal custody of the father, and the time frame in which those services and steps needed to be completed. At times Mr. Sharks would talk erratically and not be focused, and the Court took great care to ensure he understood what was required of him. At other times, he would talk clearly and appropriately. That is why, from the day after the disposition-hearings the Court appointed a guardian ad litem for Mr. Sharks.

The juvenile's foster mother, Jessica (last name withheld), testified today that the juvenile attends ninety (90) minutes of speech therapy, sixty (60) minutes of developmental therapy, and sixty (60) minutes of occupational therapy each week. The juvenile is prescribed a Flovent inhaler, two (2) times per day, for reactive airway, a nebulizer (which is an albuterol breathing treatment for shortness of breath and wheezing), as needed, and Ranitadine, for his reflux, two (2) times per day. The Court finds this foster mother to be very capable and very truthful. She testified that parenting this juvenile is a full-time job because of his therapies, many medical appointments, many medical issues, and the time it takes to work with him on his speech development. He is very time intensive, has had many medical emergencies, has been hospitalized several times for breathing difficulties. He gets frequent upper airway infections, and is not like average children because of his difficulty breathing; frequent updrafts and suctioning help his breathing.

. . . .

DHS has made reasonable efforts throughout this case to provide appropriate services. Although the Court believes Mr. Sharks today when he says he is a different person, this Court finds this different person has arrived too late and has done too little before now to show his commitment to complying with the case plan and court orders to become a fit parent who can safely be around his child and even be the parent who has custody. Despite the offer of such services from DHS, the father has shown the

incapacity and indifference to remedy the subsequent factors or issues or to rehabilitate the circumstances that prevent placement of the juvenile in the custody of the father.

. . . .

In making this determination to grant the petition for termination of parental rights, the Court has included its consideration of the following factors: the likelihood that the juvenile will be adopted if the termination of parental rights petition is granted; and the potential harm, specifically addressing the effect on the health and safety of the juvenile, caused by returning the juvenile to the custody of the parents. . . . [Sharks] does not recognize, even today, his problem with alcohol, and [ ] needs long-term support to address his issues. . . .

Placing custody of the juvenile with the father could harm the juvenile's health and safety, because father's last minute efforts to remedy the causes of the juvenile's removal are simply not enough to sidetrack this juvenile's permanency. In addition, father's insistence that he is not an alcoholic, and can imbibe alcoholic beverages without any risks or repercussions does not bode well for a child who relies on an appropriate caregiver to meet all of his many needs. Father needs long-term, intensive therapy to address his issues in order to put him on a long path to becoming a fit parent.

DHS has an appropriate plan for permanent placement of the juvenile. That plan is adoption. Danyetta Pride, the adoption specialist, testified that there is a very good likelihood that juvenile will be adopted if the petition to terminate parental rights is granted. Her testimony indicated there are three hundred and fifty nine (359) potential families who have indicated that they are willing to consider adopting children with [D.S.]'s age, race and characteristics. The positives for adoption are that he is a young child with no major behavior issues, no mental health problems, and his medical issues are being addressed.

### III. *The Child's Best Interest*

A circuit court's order that terminates parental rights must be based on clear and convincing evidence. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction that the allegation has been established. *Pratt v. Ark. Dep't of Human*

*Servs.*, 2012 Ark. App. 399, 413 S.W.3d 261.  Proof of only one statutory ground is sufficient to terminate parental rights.  *Gossett v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 240, 374 S.W.3d 205.

We review termination-of-parental-rights cases de novo.  *Cheney v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 209, 396 S.W.3d 272.  But we will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made.  *Id.*  In determining whether a finding is clearly erroneous, we give due deference to the opportunity of the circuit court to assess the witnesses' credibility. *Id.*

## A.  Adoptability

Sharks argues first that DHS produced "bare minimum" evidence of D.S.'s adoptability and that the court's finding that "there is a very good likelihood" that D.S. will be adopted is clearly erroneous.  Sharks further contends that it was unclear that Pride "even understood just how severe D.S.'s medical issues were" and did not explain what "characteristics" she used in her database search.  In Sharks's mind, this renders the court's adoptability determination "absolutely legally infirm."  He asks us to reverse the termination decision because DHS produced insufficient evidence of D.S.'s adoptability.

To terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child,

caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i)–(ii). While the likelihood of adoption must be considered by the circuit court, that factor is not required to be established by clear and convincing evidence. *Hamman v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 295, at 9, 435 S.W.3d 495, 501.

A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Caldwell v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 144, at 5, 484 S.W.3d 719, 722. But adoptability is not an essential element of proof. *McDaniel v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 263. The statute does not require any "magic words" or a specific quantum of evidence regarding a child's adoptability but simply provides that the circuit court consider the likelihood that the child will be adopted in making its best-interest determination. *See Smith v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 753, at 7, 431 S.W.3d 364, 368–69; *see also Renfro v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 419, at 10, 385 S.W.3d 285, 290. *But see Grant v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 636, at 13, 378 S.W.3d 227, 233 (reversing court's best-interest finding when caseworker testified "all children are adoptable," the child's autistic condition was not considered in determining whether that child was adoptable, and where the child was "attached to a loving mother who has never volitionally subjected him to harm").

We agree with Sharks that one particular finding in the circuit court's order is factually incorrect. The termination order states, "Danyetta Pride, the adoption specialist, testified that there is a very good likelihood that [the] juvenile will be adopted if the petition to terminate parental rights is granted." But Pride did not testify about a "very good likelihood" that D.S. would be adopted. She did, however, testify that there were 359

potential families willing to care for a child with D.S.'s age, race, and characteristics. When asked if there were "positive facts" that supported adoption, Pride answered, "Yes, a young child with no major behavior issues, no mental health problems. He has some medical issues, but they're being addressed so, yes."

The issues surrounding D.S.'s medical needs were developed during the termination hearing. D.S.'s foster mother described D.S. as the most "time-intensive" child she had cared for. She classified the level of involvement with D.S. every day as a "full-time job" between his hours of therapy and medical appointments per week. She said that she had taken D.S. to the doctor 20–25 times, not including therapy he receives in the home multiple times a week. D.S. also had to go to the emergency room because of reactive-airway disease and when he gets respiratory infections "he's not like the average child" and has difficulty breathing.

DHS caseworker Jessica Warren testified that D.S. has a swallowing dysfunction, acid reflux, physical delays and cognitive delays but that adoption specialist Pride knew about those issues. Warren also agreed that Sharks was aware of D.S.'s medical issues and could appropriately care for D.S. "if he's not under the influence." When asked what the potential harm of returning D.S. to his parents would be, Warren replied:

> The potential harm to returning [D.S.] to Mr. Sharks at this time would be—the Department doesn't know if—when and if Mr. Sharks will, you know, drink alcohol or get under the influence to where he's acting erratic and violent, and puts the child in the same situation when the child was removed. Also, the relationship that Mr. Sharks and Ms. Jordan share together, it—it has been violent throughout the case . . . physical. I believe that the child was in their presence and Mr. Sharks—Ms. Jordan is stabbing Mr. Sharks; the baby could—it—put in harm's way. It's not fair to—to the child to have to—to go through something like that when the parents have their own problems that need to be worked out.

Warren explained that Sharks had demonstrated stability only within the last month and a half of the case and that the Department would need to see more stability and sobriety before D.S. could safely be returned.

We hold that the court's ultimate conclusion that terminating Sharks's parental rights was in D.S.'s best interest is not clearly erroneous. The polestar consideration is that, after consideration of all relevant circumstances, a termination of parental rights is in the child's best interest. *See McFarland v. Ark. Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005). While no witness in this case testified that D.S. "was adoptable" or said that there was a "very good likelihood" of adoption, it is clear enough from the record that the circuit court did what it was statutorily required to do: consider the likelihood that one-year-old D.S. would be adopted. While Sharks may have been able to care for D.S. if he remained sober, the circuit court could find that D.S.'s need for permanency through adoption outweighed Sharks's need for time to walk the "long path to becoming a fit parent." We are not firmly and definitely convinced that a mistake was made and affirm on this point.

### B. Potential Harm

Sharks also argues that DHS produced insufficient evidence of potential harm in returning the child to him. Potential harm is a factor that the circuit court must consider in assessing the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A)(ii). The court is not required to find that actual harm would ensue if the child were returned to the parent nor to affirmatively identify a potential harm. *Dowdy v. Ark. Dep't of Human Servs.*, 2009

Ark. App. 180, 314 S.W.3d 722. The potential-harm analysis is to be conducted in broad terms. *Thomsen v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 687, 370 S.W.3d 842.

Here, the circuit court did not err in its consideration of the potential-harm factor. Although Sharks tried to rehabilitate himself in the eleventh hour, these improvements need not be necessarily credited by the circuit court and do not necessarily outweigh evidence of prior noncompliance. *See Henderson v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 191, 377 S.W.3d 362. By the time Sharks had been released from jail and had begun serious rehabilitation efforts, D.S. had been in DHS custody for nearly a year. Over the course of the case, Sharks tested positive for alcohol, was arrested at least twice for public intoxication, and was inconsistent in visiting D.S. While Sharks's purposeful efforts to complete most of the significant aspects of the case plan in the six weeks before the termination hearing are admirable, they do not warrant reversal. Had Sharks put forth those efforts earlier in the case, a termination may have been prevented, but Sharks's efforts to get his life together were still a work in progress at the time of the termination hearing. Given Sharks's history of mixing prescription medications and alcohol, his arrests for public intoxication, and his odd behavior during previous hearings, the court was not clearly wrong to find a likelihood of potential harm if D.S. was to return to his custody. Past actions of a parent over a meaningful period of time are good indicators of what the future may hold. *Thompson v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 167, 374 S.W.3d 143. Sharks's behaviors over the course of the entire case do not show enough stability and sobriety to render the court's finding that Sharks posed a risk of potential harm to D.S. clearly erroneous.

### C. Too Little, Too Late?

Sharks also argues that the circuit court's statement that a "different person has arrived too late and has done too little before now to show his commitment to complying with the case plan and court orders to become a fit parent who can safely be around his child and even be the parent who has custody" is clearly prohibited by *Prows v. Arkansas Department of Health & Human Services*, 102 Ark. App. 205, 283 S.W.3d 637 (2008). In *Prows* we held that a circuit court erred as a matter of law when it refused to consider or weigh evidence about a parent's recent improvements in a termination-of-parental rights case. There, the circuit court stated from the bench that it was required to terminate a parent's rights if a child was not able to go home with the parent immediately after the hearing. We said that the termination statute requires the circuit court to consider a parent's compliance during the entire dependency-neglect case and the evidence presented at the termination hearing in deciding whether termination is in the child's best interest. Ark. Code Ann. § 9-27-341(a)(4)(B). Here, the circuit court clearly considered and weighed Sharks's compliance throughout the entire case and did not lightly reject his last-minute efforts. Because the court considered and weighed everything and excluded nothing, there is no reversible error under *Prows*. We affirm on this point.

### IV. *Statutory Ground For Termination*

To terminate parental rights only one statutory ground is needed. Here the circuit court terminated Sharks's parental rights using the "other factors" ground:

> [O]ther factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested

12

the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*).

Sharks argues that the court erred when it terminated his rights because "there is nothing in the record to demonstrate that the issues addressed by the case plan were not remedied, or at least so insufficiently addressed that termination was warranted."

The circuit court did not err in terminating Sharks's parental rights on this statutory ground. Subsequent factors bearing on Sharks's parental fitness arose after the filing of the original dependency-neglect petition in this case. These included a positive alcohol screen, missed drug screens, and Sharks's arrests and incarceration on public-intoxication charges. Sharks also did not comply with the court's orders to obtain a psychological evaluation and a drug-and-alcohol assessment until just days before the termination hearing. He did not have a stable living situation for the court to place D.S. with him, not when the termination hearing convened. Sharks's excuse of not understanding what was required of him is a credibility determination that the circuit court was permitted to make. While there was evidence that Sharks was complying with the case plan, the court did not have to ignore that his compliance did not begin until the "eleventh hour." S*ee Camarillo-Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 354, 201 S.W.3d 391, 400 (2005). The circuit court did not have to credit Sharks's statement that he did not know that he had been ordered to cooperate with DHS and participate in counseling and that he "was pretty much dumbfounded" when he finally understood "all the ramifications of this Court proceeding." Given our deference to the circuit court's credibility determinations, we find sufficient

evidence to support a termination of parental rights under Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*).

Affirmed.

ABRAMSON and KINARD, JJ., agree.

*Leah Lanford*, Ark. Pub. Defender Comm'n, for appellant.

*Andrew Firth*, County Legal Operations, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.