

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-17-475

| | |
|---|---|
| JAMES KRECKER | **Opinion Delivered:** October 18, 2017 |
| APPELLANT | APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT [NO. 17JV-15-33] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE MICHAEL MEDLOCK, JUDGE |
| APPELLEES | AFFIRMED |

## KENNETH S. HIXSON, Judge

James Krecker appeals after the Crawford County Circuit Court filed an order terminating his parental rights to S.K. (DOB 7-24-2004), N.K. (DOB 5-25-2006), and J.K. (DOB 6-20-2007) on March 13, 2017.[1] On appeal, appellant argues that the trial court erred in terminating his parental rights as to S.K. only; he does not argue that the trial court erred in terminating his parental rights to J.K. or N.K. Appellant more specifically argues that it was not in S.K.'s best interest to terminate his parental rights because there was evidence from her therapists that S.K. needed to continue working on reunification with him and that it would be very hard to find her an adoptive home. We affirm.

---

[1]The trial court additionally terminated the parental rights of Crystal Krecker, the children's mother. However, Crystal did not appeal the termination and therefore is not a party to this appeal.

## I.  *Facts*

Appellant and Crystal Krecker have three children, S.K., N.K., and J.K., whose ages now range between ten and thirteen years old.  The Arkansas Department of Human Services (DHS) has had a long history of involvement with these children.  Crystal originally had custody of the three children.  While the children were in Crystal's custody, DHS opened a case in 2011.  In 2013, the children were removed from Crystal and their stepfather, David Todd, for sexual abuse, inadequate housing, and incarceration of the parents.  The three children were placed with their father, James.  At the time of this placement, James was married to Corina Krecker.  Corina has four minor children of her own.[2]  When James's three children were placed with him, that resulted in seven children living in the home.

Two years later, the instant proceedings commenced.  It was discovered that S.K., N.K., and J.K. had bruises on their upper thighs.  DHS was contacted and determined that the bruising was consistent "with being struck with a belt in an out of control or violent manner that indicates their caretaker is behaving towards the children in a manner that is violent or out of control."  On January 21, 2015, DHS placed a seventy-two-hour hold on S.K., N.K., and J.K.  Further investigation revealed that the bruising was caused by the stepmother, Corina.  DHS removed appellant's three children from the home but allowed Corina's four children to remain in the home because there were no signs of physical abuse to them.  Accordingly, on January 26, 2015, DHS filed a petition for ex parte emergency

---

[2]The record is unclear whether appellant is the father of some, or all, of these four children.

SLIP OPINION

custody and dependency-neglect of S.K., N.K., and J.K. The trial court granted the petition, finding that probable cause existed for the removal. Subsequently, the trial court filed a probable-cause order.

An adjudication hearing was held on April 30, 2015. The record indicates that appellant attended the hearing. The trial court found that the three children were dependent-neglected as defined in the Arkansas Juvenile Code and that the allegations in the petition were true and correct. Specifically, the trial court found that the children were dependent-neglected due to the physical abuse perpetrated by the stepmother, Corina, and due to the failure to protect perpetrated by appellant.

Several review hearings were held throughout this case. A permanency-planning hearing was held on February 18, 2016, and a permanency-planning order was filed on May 12, 2016. In that order, the trial court noted that the goal of the case was to authorize a plan to place custody of the children with their father. Appellant had been partially complying with the case plan. The trial court ordered that placement of the children occur within a time frame that was consistent with their developmental needs but no later than three months after the permanency-planning hearing. Additionally, the trial court made the following additional findings:

> 9. The father and step-mother have partially complied with the case plan in that they have completed regular parenting classes, have completed a psychological evaluation, have begun family therapy, they have appropriate beds for the children and a separate room for [S.K.], they have visited consistently and have maintained employment. They have not finished Parenting Without Violence classes, have not attended individual counseling as recommended and continue to have some environmental issues in the home. They need to make arrangements for the children to be supervised while the parents work or sleep. They also need to address environmental concerns with the home including the roach and mice infestation, *and*

 

*they need to obtain an alarm to put on [S.K.'s] bedroom.*[3]  They have missed some parenting classes during this review period.

10.  The father and step-mother are ordered to follow the recommendations in their psychological evaluation for individual and family therapy; participate in family therapy as recommended by the juveniles' therapist; make arrangements for the children to be supervised while the parents work or sleep; address the roach and mice infestation *and obtain an alarm to put on [S.K.'s] bedroom*; finish Parenting Without Violence classes, visit regularly and actively participate in the visitation; and otherwise comply with the case plan.

(Emphasis added.)

During a weekend visit in which the three children were allowed to stay at appellant and Corina's home, an incident occurred.  J.K. disclosed that S.K. and E.W., one of the four children who had remained in the home, had touched her in a sexual manner one night during visitation.  One of the requirements for the weekend visitation was that an alarm was to be placed on S.K.'s bedroom.  While an alarm was obtained and verified as working before the visitation began, it was alleged that appellant and Corina did not turn the alarm on for S.K.'s bedroom.  Thus, the trial court suspended all weekend visitation and ordered supervised visitation as recommended by the children's treatment professionals. Furthermore, E.W. was removed from the home.

After the September 22, 2016 review hearing, the trial court changed the goal of the case from reunification with appellant to adoption.  The trial court noted that the father and stepmother had not complied with the case plan and that they had participated in only one family-therapy appointment and refused to attend any other scheduled appointments. Furthermore, the trial court found that they had not complied with the safety plan during a

---

[3]The record does not detail the ongoing conduct of S.K. that necessitated that her bedroom door be equipped with an alarm.

weekend visit by ensuring that the alarm was working on S.K.'s bedroom. Finally, the trial court found that they had not attended individual or marital counseling as recommended.

DHS filed a petition for termination of parental rights on December 8, 2016. As to appellant, DHS alleged several grounds for termination under Arkansas Code Annotated section 9-27-341(b)(3)(B) (Repl. 2015), including the failure-to-remedy, other-subsequent-factors, and aggravated-circumstances grounds.

At the termination hearing, appellant testified that he did not want his parental rights terminated. At the time of the hearing, appellant testified that Corina and his remaining three younger children (S.W., J.K.J., and Z.K.) were living in the home with him.[4] Appellant acknowledged that Corina had spanked S.K excessively. However, appellant testified that he had been complying with the case plan and that he still had to complete marriage counseling. He testified that he had completed parenting classes, maintained employment, kept stable housing, visited the children regularly, and completed a psychological evaluation. Appellant testified that he had been diagnosed with a personality disorder.

Erica Enecks testified that she had been involved in this case when she was a family-service worker and later as a family-service-worker supervisor. Her involvement with the children started in 2013 after the three children had been removed from their biological mother's care because they were being sexually abused by their stepfather and step-grandfather. After the children were placed in appellant's custody, the children were

---

[4]S.K., N.K., and J.K. had been removed from the home in the original order, and E.W. had been removed from the home after the inappropriate sexual-touching incident involving S.K.

removed after Corina had left significant bruising on S.K., J.K., and N.K. from spanking them with a belt. Enecks testified that appellant had not continued with consistent counseling since the children had been removed. Multiple referrals were made throughout the pendency of the case. Enecks further testified that appellant had willfully failed to follow the safety plan during an overnight visit, resulting in an additional sexual-abuse allegation and the suspension of overnight visitation. Regarding whether S.K. was adoptable, Enecks opined that S.K. would be adoptable with the right family even though she had considerable issues in her life. She acknowledged that S.K. required a special sort of foster home. However, Enecks testified that S.K. had maintained stability in her current foster home for quite some time.

Van Hall, the assistant clinical director for Southwest Arkansas Counseling and Mental Health Center in Texarkana, Arkansas, testified that she had previously been S.K.'s therapist. Hall was now in a different supervisory position. Hall testified that there had not been any progress made during family-therapy sessions with S.K. and appellant. Appellant failed to attend regular appointments when Hall was S.K.'s primary therapist. Additionally, Hall expressed concerns over appellant's failing to follow the safety plan that was drafted for overnight visitation. Despite Hall's discussion of the plan with appellant, the first overnight visit resulted in inappropriate interactions between S.K. and other siblings due to the lack of supervision. Hall testified that she was not comfortable making a recommendation that S.K. be returned to appellant's care based on appellant's lack of involvement while she was S.K.'s primary therapist. Hall did note, however, that since the last court hearing, appellant's participation had increased with S.K.'s new therapist after Hall had transitioned into her

supervisory role. On cross-examination, Hall admitted that S.K. would be unable to form an attachment with appellant if appellant's rights were terminated. She further admitted that S.K.'s loss of attachment with appellant would be detrimental to S.K. However, Hall opined that S.K. could process through some of the loss with the proper therapy or treatment and that S.K. could form a more healthful attachment with another male or father figure in the future.

Toni Hagans, S.K.'s therapist at the time of the hearing, testified that appellant had been attending family-therapy appointments every other week since September 2016. However, Hagans testified that appellant had difficulty noticing S.K.'s anxiety. In fact, Hagans testified that appellant would ignore S.K. when she would attempt to get his attention. Therefore, Hagans testified that "we're not where we need to be at this point[.]" That said, Hagans opined that it was not in S.K.'s best interest to have appellant's parental rights terminated because S.K. wanted to be with her father. Furthermore, Hagans testified that she had only just started working with appellant and did not feel that she had enough time to make a recommendation. Additionally, although Hagans recognized that adoption was not part of her job description, Hagans opined that she thought S.K. may have difficulty being adopted and that, if she was never adopted, it could be even more traumatic.

After the hearing and oral arguments, the trial court terminated appellant's parental rights to each child. In the termination order, the trial court made the following pertinent findings:

u. The preceding paragraphs demonstrate that James and Corina Krecker are not capable of implementing strategies in their home that would protect the juveniles from further sexual acting out in the home. The Court notes that

 

the sexual abuse among siblings going on in the home led to physical abuse of the juveniles, the reason they were found dependent-neglected.

v.  Van Hall also testified that James Krecker was very withdrawn in his interactions with [S.K.]. She believed this was due to his anti-social personality disorder diagnosis. Van Hall testified that this was something that James Krecker could address and improve through his participation in individual counseling. Van Hall offered that based on her interactions while she was [S.K.'s] therapist, she did not believe [S.K.] was ready for reunification with her father at the time she transferred the case. Further, Ms. Hall testified that the father participated in very few sessions of family therapy. She stated that Mr. Krecker refused to participate further unless services could be offered on a Saturday.

w.  [S.K.'s] current therapist Toni Hagans testified that James Krecker's participation has been consistent since September of 2016. The Court notes that this is the same time that the Court changed the goal of the case to termination of parental rights and adoption. This demonstrates that Mr. Krecker has been capable of participating in services throughout this case, but was not so motivated until the goal of this case changed.

x.  The Court notes that Toni Hagans was not in a position to recommend reunification of [S.K.] with her father at this time.

y.  James and Corina Krecker were also to participate in individual counseling. The father's own testimony demonstrated that he had not regularly participated in this service and had not addressed his anti-social personality disorder in order to improve his parenting skills. The Court notes that multiple referrals were made by the Department for this service.

z.  Erica Enecks testified that James Krecker has not been able to demonstrate the skills required for reunification that should have been developed through meaningful participation in the services herein. This coupled with the facts articulated above demonstrate why the juveniles would be subject or risk of harm if returned to the custody of either parent.

aa.  *Erica Enecks further testified that all of the juveniles were adoptable. [J.K.] and [N.K.] have maintained in the same foster home through much of this case. Also, despite [S.K.'s] behaviors, the Department believes that it can achieve the goal of adoption for [S.K.] as well, as she has maintained long term stability in her foster home. Testimony demonstrated that there are no barriers to adoption.*

bb.  The Court finds on the facts stated above that the Department has proved by clear and convincing evidence that:

i.      The juveniles have been adjudicated by the Court to be dependent–neglected and have continued out of the custody of the father for a period in excess of twelve (12) months and despite a meaningful effort by the Department to rehabilitate the father and correct the conditions which caused removal, those conditions have not been remedied by the father.

ii.     Specifically, the father's lack of participation in and completion of services have not put the family in the position to be reunified.

iii.    The juveniles have lived out of the home of the mother for a period in excess of twelve (12) months and the mother has willfully failed to provide significant material support in accordance with her means or to maintain meaningful contact with the juveniles.  The mother has also subjected the juveniles to the aggravated circumstance stated above.

iv.     That other factors arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juveniles in the custody of the father is contrary to the juvenile's health, safety, or welfare and that despite the offer of appropriate family services, the father has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the circumstances which prevent the placement of the juvenile in the custody of the father.  The father's failure to appropriately implement plans to deal with sexually aggressive behaviors in his home is a subsequent factor that the father has failed to remedy.

v.      The father has subjected the juveniles to aggravated circumstances in that there is little likelihood that services to the parents will result in successful reunification.  The father has had almost two years to accomplish the goals of this case and has failed to do so.  There is little likelihood that additional services would remedy the father's failure to implement significant change in his life.  Additional time to the father would be detrimental to the juveniles' permanency interests and have little likelihood of success.

It is therefore, Considered, Ordered, Adjudged and Decreed that the parental rights of the Parents, James Krecker and Crystal Krecker are hereby terminated[.]

(Emphasis added.)  This appeal followed.

II. *Best-Interest Analysis*

A trial court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2015). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Human Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Reid v. Ark. Dep't of Human Servs.*, 2011 Ark. 187, 380 S.W.3d 918.

Appellant argues on appeal that the trial court erred in terminating his parental rights as to S.K. only. However, appellant does not contest that statutory grounds existed; instead, he argues that it was not in S.K.'s best interest to terminate his parental rights because there was evidence from her therapists that she needed to continue working on reunification with him and that it would be very hard to find her an adoptive home. Although appellant acknowledges Enecks's testimony that S.K. would be adoptable, he states that the testimony from S.K.'s therapists should have been accepted as more objective evidence. He claims that Hall and Hagans testified that it would be detrimental to S.K. if she did not continue to work on attachment issues with appellant and that S.K. would be very hard to adopt, which would lead to greater trauma than the termination itself. Therefore, appellant contends that the evidence demonstrated that the termination would harm S.K. and that her likely inability to achieve adoption would compound that harm. Thus, he requests this court to reverse the trial court's termination. We disagree.

A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Caldwell v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 144, 484 S.W.3d 719. However, adoptability is not an essential element of proof and need not be established by clear and convincing evidence, but it is merely a factor that must be considered by the trial court in determining the best interest of the child. *Id.*; *McDaniel v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 263. The statute does not require any "magic words" or a specific quantum of evidence regarding a child's adoptability but simply provides that the trial court consider the likelihood that the child will be adopted in making its best-interest determination. *See Smith v. Ark. Dep't of Human Servs.*, 2013 Ark. App.

753, 431 S.W.3d 364; *see also Renfro v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 419, 385 S.W.3d 285. *But see Grant v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 636, at 13, 378 S.W.3d 227, 233 (reversing a court's best-interest finding because a caseworker testified that "all children are adoptable," the child's autistic condition was not considered in determining whether that child was adoptable, and the child was "attached to a loving mother who has never volitionally subjected him to harm").

Here, the trial court specifically noted in its opinion that it considered Enecks's testimony in determining S.K.'s best interest. Enecks testified that S.K. would be adoptable. In giving her opinion, Enecks noted that S.K. had maintained stability in her foster home and that with the right family she could achieve a successful adoption. Although appellant highlights selected excerpts from the testimony of S.K.'s therapists to bolster his position, neither therapist recommended that S.K. be returned to appellant's custody. In fact, Hall even opined that with the proper therapy or treatment, S.K. could form a more healthful attachment with another male or father figure in the future. Furthermore, while Hagans testified that she thought S.K. would be difficult to adopt, Hagans acknowledged that DHS, not she, was tasked with finding an adoptive family.

Finally, in assessing the potential-harm factor, the court is not required to find that actual harm would ensue if the child were returned to the parent or to affirmatively identify a potential harm. *Sharks v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 435, 502 S.W.3d 569. The potential-harm analysis is to be conducted in broad terms. *Id.* Past actions of a parent over a meaningful period of time are good indicators of what the future may hold. *Id.* Here, appellant's behaviors over the course of the entire case as outlined above do not

show enough stability to render the trial court's finding that appellant posed a risk of potential harm to the children clearly erroneous. In fact, appellant failed to follow the safety plan during the last overnight visitation. Therefore, based on this record, we cannot say that the trial court's finding that termination was in S.K.'s best interest was clearly erroneous. As such, we must affirm the termination.

Affirmed.

ABRAMSON and VAUGHT, JJ., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.