RITA W. GRUBER, Chief Judge
Michelle Androff appeals from the circuit court's order terminating her parental rights to RA, born 8/25/2008.[1] For reversal, Michelle argues (1) that the Arkansas Department of Human Services (DHS) failed to present sufficient evidence to support the grounds for termination and (2) that the circuit court erred in terminating her parental rights because DHS offered insufficient evidence that termination was in RA's best interest. We affirm.
I. Procedural History
This termination action began when DHS took emergency custody of RA on September 21, 2016, after learning that Jack Androff, RA's biological father and a convicted sex offender, was living in the home with Michelle and RA in violation of a no-contact order between Jack and RA. However, DHS involvement with the Androff family began in 2012.
RA and her siblings, JA1(11/26/96) and JA2(12/03/98),[2] were adjudicated dependent-neglected *535 on October 24, 2012,[3] based on a true finding of sexual contact between JA1 and the victim, AM, Michelle's granddaughter. The adjudication order also noted a pending investigation involving Jack as the alleged offender and AM and RA as the alleged victims. It was alleged that Jack had asked AM and RA to perform oral sex on him. The adjudication order provided that Michelle was to retain custody of RA and prohibited Jack from having any contact with RA.
On November 1, 2012, DHS took emergency custody of RA after DHS learned that Michelle had allowed Jack to trick or treat with RA on October 31, 2012. Following a probable-cause hearing, the court found that RA should continue in the custody of DHS and that Jack have no contact with RA. During a permanency-planning hearing in January 2014, Jack admitted having sexually abused AM, as well as AM's mother MM (Michelle's daughter and Jack's stepdaughter) while she had been a minor living in the home. The court ordered that RA remain in DHS custody, Michelle have supervised visitation with RA, and Jack have no visitation with RA.
On January 7, 2014, Jack pleaded nolo contendere to second-degree sexual assault (with the victim being five years old) and was sentenced to five years' probation and required to register as a sex offender.
A permanency-planning order was entered on March 20, 2014, providing that custody could not be placed with Michelle and that the goal of the case plan was to place custody of RA with a parent, guardian, or custodian. The court found that Michelle was compliant with her case plan and making significant progress in remedying the condition that caused removal but had concerns about the testimony involving her family and Jack's testimony regarding the "generational curse" that is affecting his family. The court found that Jack, at the hearing, had admitted sexually abusing AM, his stepdaughter's child, when AM was living in his home, as well as AM's mother when she was a minor living in his home. The court ordered that Jack have no contact with RA.
In a permanency-planning order filed March 9, 2015, the circuit court continued custody of RA in DHS and set the goal of reunification with Michelle with a concurrent goal of permanent relative custody. The court found that Michelle was making substantial progress to complete the goals and tasks of the case plan. The court ordered that Jack have no contact with RA. A review order filed June 10, 2015, indicated that RA remained in the legal custody of DHS but had been in a trial placement with Michelle since May 6, 2015. Again, the court ordered that Jack have no contact with RA. After a review hearing on June 17, 2015, DHS returned custody of RA to Michelle, specifically noting the standing no-contact order between Jack and RA.
On April 4, 2016, the circuit court held a review hearing and found that permanency with Michelle had been achieved. The resulting review and closure order, which was not filed until August 31, 2016, specifically stated that the court "denies the request of Jack Androff for visitation with his family" and that the no-contact order between Jack and RA remained. The court closed the case.
The current action began on September 21, 2016, when DHS exercised a seventy-two hour hold on RA after it was determined that the no-contact order between Jack and RA had been violated. On September 23, 2016, DHS filed a petition for emergency custody of RA, alleging that *536 RA was dependent-neglected. The affidavit in support of the petition indicated that RA was interviewed at school and told the family service worker that Jack lived in the home with her. RA told the worker that she was told to say that she has not seen her father if anyone ever asked. The affidavit also stated that Michelle was interviewed and admitted that Jack was living in the home with her and RA. She stated that she did not have concerns about Jack's being around RA and that she did not believe his history of abuse was an accurate description of Jack as a person. Jack refused an interview but spoke with the family service worker by phone. The affidavit stated that Jack wanted the family service worker to know "he has turned his life over to Christ and he wanted to raise his family in the ways of the Lord." The affidavit suggested that both Jack and Michelle thought they were justified in their actions because the DHS case was closed.
The circuit court granted the ex parte order for emergency custody on September 23, 2016. On October 12, DHS filed a motion for no-reunification services and petition for termination of parental rights on the grounds of aggravated circumstances, subsequent factors, and that the juvenile or a sibling was dependent-neglected as a result of neglect or abuse that could endanger the life of the child, any of which was perpetrated by the juvenile's parent or stepparent. The petition alleged that Jack is registered as a level-three sex offender and had not been legally permitted to see RA since 2012; and that Michelle has violated no-contact orders between Jack and RA-going as far as remarrying Jack after the DHS case closed in April 2016-where the circuit court specifically ordered both parents that Jack was to have no contact with RA and was not to reside with the family. The petition further alleged that Michelle was not capable of protecting RA's health, safety, and welfare; RA was adoptable; and it was in RA's best interest to be "opened up" for permanent placement. DHS's petition outlined the lengthy history with this family.
An adjudication hearing on the dependency-neglect petition took place on December 14, 2016. The court found that Michelle and Jack resumed a relationship and remarried on August 13, 2016; Jack and Michelle began living together as a family in violation of the no-contact order; RA was dependent-neglected based on Michelle's failure to protect RA from abuse by allowing her to have contact with Jack; RA was dependent-neglected as a result of parental unfitness by Jack; and RA was at substantial risk of harm. The court set the goal as adoption.
An initial termination hearing took place on March 31, 2017. Jack appeared pro se and indicated he did not want appointed counsel. The following week, when the court was to announce its decision, Jack appeared and stated that he should have been represented by counsel. The court appointed counsel for Jack and granted a new trial. After multiple continuances, the termination hearing was held November 27, 2017.
II. Termination Hearing
At the termination hearing, Jack testified that DHS had become involved with his family in 2012, at which time he was married to Michelle. He stated that he had been ordered to move out of the house and thought that he was not supposed to see RA but did not have a "clear understanding." Jack testified that he wanted to see RA trick or treat on Halloween, and after doing so, RA was removed from Michelle's home and placed in foster care. He recognized that it was his decision to watch her *537 trick or treat that caused RA to go into foster care. He was not allowed any visitation with RA. He indicated that the case was open a "long time" and that when Michelle got RA back in 2016, he asked the judge if he could see RA. He explained to the judge that he had found a new life in Christ and wanted to be the biblical head of his family, but the judge did not allow him to see RA. Jack asked the DHS caseworker, Miranda Monroe, what he needed to do to see RA and Monroe told him he needed to go back to court.
Jack acknowledged that he "messed up" in going against the court's orders to see RA. He stated he "got tripped up" because he thought the probation document permitted him to see his biological children.[4] He explained that he reached out to Michelle shortly after the case closed in 2016. He told Michelle that his probation documents stated that he could see his biological children, and she allowed him to see RA. He assumed he could see his biological children since he did not "do anything" with them. Jack and Michelle got back together and remarried in August 2016. He stated that when she got back together with him he knew she was struggling and offered to help support her financially.
Jack also testified about the sexual offenses he had committed against Michelle's granddaughter (AM) when she was four years old and Michelle's daughter (MM, who he raised as his own since she was four or five years old) when she was ten or eleven years old. He stated that he put a "back vibrator" on MM's vagina on one occasion to sexually stimulate her. On three or four occasions, he had AM, "kiss" his penis and "put it in her mouth." Jack recalled that RA had been home when this happened with AM.
Jack also testified that prior to his abusing AM, he looked at child pornography on the internet using his sons' Nintendo Wii. He stated the pornography had a lot to do with his "offending" AM and that "stupidity" caused him to "offend" Michelle's daughter.
Michelle Androff testified that at the time of the termination hearing, she was no longer married to Jack. She stated that DHS had been involved with her family from 2012 to 2016. In testifying about the prior DHS case, Michelle admitted that she allowed Jack to watch RA trick or treat even though there was a no-contact order. Michelle also acknowledged that there were three years when Jack was not able to see RA when she was trying to get RA back. She stated that she knew that if she got RA back, Jack would not be allowed to see RA.
Michelle testified that her daughter MM was eleven years old when she told Michelle that Jack had touched her. Michelle confronted Jack, but he denied it. She stayed with Jack and sent MM to live next door at her mother's house. When MM told her that AM indicated in counseling that Jack had done something to her, Michelle left with the children to live with her grandmother. Michelle confronted Jack about AM's accusation, which he denied. She stated that Jack later admitted to molesting MM and AM before a court *538 hearing, at which time RA had been in DHS custody for about a year.
Michelle acknowledged that when the case was closed in the spring of 2016, the court ruled that Jack was not allowed to see RA. She explained that Jack contacted her a week after the case closed and told her he was allowed to see RA. She explained that initially she refused to allow Jack to see RA. Jack showed her a piece of paper and told her that "he won an appeal" and if she did not believe him to call his probation officer. Michelle spoke with his probation officer on two occasions. The first time she went alone, and the probation officer asked if Jack was pressuring her to do something she did not want to do. On the second occasion, she was with Jack. She stated the officer was looking at a legal document and stated he did not see anything that would keep him from being around his family. She claimed he did not see anything wrong with her getting back together with Jack. Michelle admitted that she never contacted anyone at DHS but asked the probation officer to do so.
The first time RA saw Jack was the night of her dance recital in May 2016 when Michelle was taking their boys to Jack's brother's home. Jack came up to the car and RA got out and hugged him. Michelle testified that she began seeing him at the end of May and later moved in with him; she remarried him in August. Michelle acknowledged that she was aware when she resumed talking to him in the spring of 2016 that Jack had abused her daughter and AM. She explained that she thought he had changed because he had been in counseling and Bible study, and he also taught Sunday school.
Michelle testified about her counseling and how issues were brought up about her dependency on Jack. She stated that she did not know how she let MM move out of her house while she stayed with Jack but admitted she was dependent on him and they had other children together. Michelle testified that she did not think Jack was reformed. She also talked with her counselor about Jack's history of sexual abuse and sexual addiction and that it is something that is very hard to change. She stated that the counseling in the second case was better than the first case and that it has helped her delve into her codependency and see some of Jack's conditions.
Michelle stated that she attends every visit with RA and that RA is always glad to see her but that RA never wants to leave her. Michelle acknowledged that she was wrong to move back in with Jack and that with Jack in the home, she could not protect RA and RA could not protect herself. She stated that at the time of the termination hearing, she had moved on from Jack and was at a point that she did not need to rely on anyone.
Miranda Monroe, the DHS family service worker assigned to RA's present case and part of the prior case, testified that RA was nine years old and had been in foster care for approximately four years during the two cases. Monroe testified that RA was currently in a foster home and doing well. RA attended counseling and received special services for developmental delays through school.[5] Monroe testified that RA is adoptable. She elaborated that RA is a very sweet girl and that her special needs would not prevent her from being adopted. Monroe had been on cases in which children with similar levels of needs were adopted. Monroe testified that DHS recommended to terminate the parental rights of Jack and Michelle. She *539 stated that DHS could not recommend returning RA to Jack because he is a registered sex offender and that DHS could not recommend returning RA to Michelle because she has a history of not being willing to protect RA and continues to violate court orders by allowing Jack to see RA.
As part of its recommendation, Monroe explained that DHS considered that Michelle, Jack, and JA1 were all referred to a family-treatment program with UAMS and Arkansas Children's Hospital. She stated Michelle received counseling individually and family counseling with JA1 in regards to the sexual offenses. This took place before she reunited with Jack. Monroe testified that there were no services that DHS could provide at this point to allow successful reunification with Michelle. She stated that the history of the case shows that Michelle is either incapable of fixing or unwilling to fix the problem.
The attorney ad litem testified that it was in RA's best interest for the parental rights of both Jack and Michelle to be terminated.
The court rendered its decision to terminate Jack and Michelle's parental rights on January 10, 2018, and the order was entered on February 21, 2018.[6] Michelle filed a notice of appeal on March 14, 2018.
III. Standard of Review
We review termination-of-parental-rights cases de novo. Dinkins v. Ark. Dep't of Human Servs. , 344 Ark. 207, 40 S.W.3d 286 (2001). At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights, considering the likelihood that the child will be adopted if the parent's rights are terminated and the potential harm caused by returning the child to the custody of the parent. Fox v. Ark. Dep't of Human Servs. , 2014 Ark. App. 666, at 4, 448 S.W.3d 735, 737. The grounds and best-interest finding must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2017). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. Anderson v. Douglas , 310 Ark. 633, 637, 839 S.W.2d 196, 198 (1992). The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. J.T. v. Ark. Dep't of Human Servs. , 329 Ark. 243, 248, 947 S.W.2d 761, 763 (1997). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Yarborough v. Ark. Dep't of Human Servs. , 96 Ark. App. 247, 253, 240 S.W.3d 626, 630 (2006). Credibility determinations are left to the fact-finder. Shawkey v. Ark. Dep't of Human Servs. , 2017 Ark. App. 2, at 5, 510 S.W.3d 803, 806. Finally, the intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3).
A. Statutory Grounds
The court terminated Michelle's parental rights on three grounds finding that (1) aggravated circumstances exist in that there is little likelihood that further services to the family will result in successful *540 reunification; (2) aggravated circumstances exist that RA has been adjudicated dependent-neglected based on sexual abuse perpetrated by Jack against his step-granddaughter, AM; and (3) there are subsequent factors that had arisen since the initial removal that demonstrate that it was contrary to the health, safety, and welfare of RA to be in the custody of the parents and that the parents have proved they are incapable of or unwilling to remedy. Although Michelle argues that the evidence is insufficient to support each of the grounds, we limit our discussion to the aggravated-circumstances ground based on little likelihood that services will result in successful reunification. Proof of only one statutory ground is sufficient to terminate parental rights. Hooks v. Ark. Dep't of Human Servs. , 2017 Ark. App. 687, at 11, 536 S.W.3d 666, 673.
The aggravated-circumstances ground requires proof that there is little likelihood services to the family will result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3) . There must be more than a mere prediction or expectation on the part of the circuit court that reunification services will not result in successful reunification. McLemore v. Ark. Dep't of Human Servs. , 2018 Ark. App. 57, at 12, 540 S.W.3d 730, 737.
Michelle argues that "it was only speculative that services would not result in reunification" and that the case is "haunted by Jack's transgressions." Michelle contends that in the previous case, she was assigned multiple counselors who focused on the children rather than her dependency issues as they related to Jack. She now contends that in the current case, she has received appropriate counseling and has overcome her dependency issues that caused her to allow Jack in her life. Michelle suggests that with appropriate services, she has demonstrated it is likely that successful reunification can be achieved between her and RA. She further suggests that while she accepted responsibility for her role in the present case having been opened, she argues that the case was opened due to the confusion of lay people, which included herself, Jack, and the probation officer, interpreting the "interplay" of the court's oral ruling closing the DHS case, Jack's criminal case, and a favorable administrative appeal regarding the child-maltreatment registry as to RA.
Here, the evidence presented at the termination hearing supports the circuit court's finding that there was little likelihood that reunification services would result in successful reunification under the aggravated-circumstances ground. In 2012, DHS assumed custody of RA after Michelle had violated the first no-contact order by allowing Jack to trick or treat with RA. RA remained in DHS custody until a trial placement with Michelle was authorized in May 2015. The June 10, 2015 review order and the agreed order to authorize trial home placement both prohibited contact between Jack and RA. An order was entered June 18, 2015, returning custody of RA to Michelle and noting the standing no-contact order between Jack and RA. A review hearing took place April 4, 2016, and the circuit court returned custody of RA to Michelle with clear direction that there be no contact between RA and Jack. The order entered August 31, 2016, indicates that it expressly denied Jack's request for visitation with his family, finding that the no-contact order between Jack and RA would stand. A week after custody was returned to Michelle and the case was closed, Jack began calling Michelle. Michelle allowed RA to see Jack briefly after a dance recital in May 2016, where she hugged Jack. In August 2016, Michelle remarried Jack and they began living together again as a family. After four years of services and numerous orders that there be no contact between RA and Jack, Michelle failed to protect RA
*541 from Jack, a convicted sex offender, who had admitted sexually abusing Michelle's daughter and granddaughter. Moreover, the circuit court found disturbing that Michelle admitted that she had continued her relationship with Jack during the four years of the previous case, even after he admitted to the sexual abuse and they divorced.
Based on these facts, we cannot say that the court clearly erred in finding aggravated circumstances as a ground for termination. Because only one ground is necessary to terminate parental rights, it is unnecessary for us to address the other statutory grounds.
B. Best Interest
Next Michelle contends that DHS offered insufficient evidence that termination was in RA's best interest. Michelle does not challenge adoptability but addresses only potential harm. She argues that there was no evidence she failed to protect RA because RA had never been harmed and Jack presented no specific harm to RA.
In finding that termination is in the best interest of the child, the circuit court is required to consider the potential harm to the health and safety of the child that might result from returning the child to the parent's custody. Ark. Code Ann. § 9-27-341(b)(3)(A)(ii).
In 2012, RA was removed from Michelle's custody for violating the no-contact order between Jack and RA. RA remained in DHS custody for almost four years. When RA was returned to her mother's custody in 2016, the court ordered there to be no contact between Jack and RA. While the written order was not filed until August 2016, Michelle testified that she was aware of the court's oral ruling when the case was closed in the spring of 2016. Despite this knowledge, she contends that she relied on misinformation from Jack and his probation officer to decide to resume a relationship with Jack and to live together as a family and that the decision was based on confusion caused by DHS's failure to enter the written order. Michelle now contends that she has finally gained stability in counseling and is able to be independent of Jack. Additionally, Michelle acknowledges that she violated a court order but argues that forever terminating her rights because of the violation where no harm occurred is extreme and should not be permitted.
In assessing the potential-harm factor, the court is not required to find that actual harm would ensue if the child were returned to the parent or to affirmatively identify a potential harm. Sharks v. Ark. Dep't of Human Servs. , 2016 Ark. App. 435, 502 S.W.3d 569. The potential-harm analysis is to be conducted in broad terms. Id. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. Samuels v. Ark. Dep't of Human Servs. , 2014 Ark. App. 527, at 5, 443 S.W.3d 599, 602. Finally, a parent's past behavior is often a good indicator of future behavior and may be viewed as a predictor of likely potential harm should the child be returned to the parent's care and custody. Shawkey , 2017 Ark. App. 2, at 6, 510 S.W.3d at 807.
Here, Michelle has shown a long history of not following court orders prohibiting contact between Jack and RA, and her failure to do so is sufficient to support the circuit court's finding that Michelle posed a risk of potential harm to RA. We cannot say that the circuit court's best-interest finding is clearly erroneous.
Affirmed.
Klappenbach and Vaught, JJ., agree.

This is the second time this case is before us. In Androff v. Ark. Dep't of Human Servs. , 2018 Ark. App. 416, 555 S.W.3d 914, we ordered rebriefing for abstracting deficiencies, which have now been corrected.

JA1 and JA2 are Jack and Michelle's biological sons.

The order was not entered until November 21, 2012.

Pursuant to the conditions of his probation, Jack was prohibited from having unsupervised contact with children under the age of eighteen except with his biological sons so long as it was not in conflict with any DHS order or case plan. There was also a provision that he was not to reside or stay overnight in a residence where minor children were present unless authorized in writing by the Cleburne County Circuit Court. This provision contained two handwritten notations indicating "except your biological children under supervision" and "with the exception of biological sons as set out above," referring to the provision prohibiting unsupervised contact with minors.

The record indicates that RA has an IQ of 60; she has an IEP in which she receives speech, occupational, and physical therapy as a result of her developmental delays.

Jack is not a party to this appeal.