Cite as 2025 Ark. App. 51

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-24-396

|  |  |
|---|---|
| | **Opinion Delivered** January 29, 2025 |
| JAMES L. MAYER AND ANNA M. MAYER | |
| | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT |
| APPELLANTS | [NO. 72JV-22-424] |
| V. | HONORABLE DIANE WARREN, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | |
| | AFFIRMED; MOTIONS TO WITHDRAW |
| APPELLEES | GRANTED |

## KENNETH S. HIXSON, Judge

Appellants James L. Mayer and Anna M. Mayer (collectively appellants) separately appeal after the Washington County Circuit Court filed an order terminating their parental rights to their three children, Minor Child 1 (MC1) (DOB 01-13-18); Minor Child 2 (MC2) (DOB 12-13-17); and Minor Child 3 (MC3) (DOB 10-30-19). Appellants' counsel have each filed a separate no-merit brief and a motion to withdraw as counsel pursuant to Arkansas Supreme Court Rule 6-9(j) (2023) and *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004). The clerk of this court mailed a certified copies of each counsel's motion and brief to appellants' last-known addresses informing them of their

right to file pro se points for reversal; however, they have not done so.[1] We grant both motions to withdraw and affirm the order of termination.

## I. *Relevant Facts*

On August 1, 2022, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect concerning all three children. The petition alleged that the children were dependent-neglected due to a substantial risk of serious harm on the bases of abandonment, abuse, neglect, sexual abuse, sexual exploitation, or parental unfitness. It requested a writ of assistance so that local law enforcement could assist in removing physical custody of the children from their parents. The affidavit attached to the petition outlined the allegations of physical abuse to, and visible bruising on, MC1. The affidavit also set out the family's history with DHS and the difficulty DHS had gaining physical custody of the children.

The circuit court granted the petition for emergency custody and issued a writ of assistance on August 1, 2022, finding there was probable cause to believe that the children were dependent-neglected and that it was contrary to the welfare of the children to remain in appellants' custody. Local law enforcement was directed to assist DHS in obtaining physical custody. A probable-cause order was filed on August 31, 2022. It noted that the family had been located in Kansas on August 3, 2022, and DHS obtained physical custody of the children following police assistance on that date. The circuit court found that

---

[1]Although the packets were mailed to appellants' last-known addresses, those packets were returned, and no other contact information has been provided.

2

probable cause existed and continued to exist requiring that the children remain in the custody of DHS.

An adjudication order was subsequently filed on November 27, 2022. The circuit court specifically found appellants' testimony not credible. It found that the children were dependent-neglected for the following reasons:

> As to [MC1], the grounds for dependency-neglect are abuse and parental unfitness due to the bruising caused by James Mayer, and failure to protect by Anna Mayer. As to [MC2], the grounds for dependency-neglect are abuse of a sibling and parental unfitness due to the bruising on [MC1] cause by James Mayer. As to [MC3], the grounds for dependency-neglect are abuse of a sibling and parental unfitness due to the bruising on [MC1] caused by James Mayer. [MC1] had injuries that were non-accidental in nature. [MC1] was dismissed from school on July 21, 2022 with no bruises and came back to school on July 25, 2022 with bruises. Both parents testified that James Mayer was with [MC1] during that timeframe. Testimony indicates that [MC1] was punished for smearing poop on the walls. James Mayer stated in his testimony: "I left a red mark. I don't know if it bruised." James Mayer also stated in his testimony: "I popped him once on the butt." The bruising on [MC1] was not transitory in nature, as it was evident days after the incident. The testimony indicated that Anna Mayer was in the hospital at the time of the incident, but even if she did not know immediately that James Mayer had caused injuries to [MC1], once she did find out, she did not cooperate with the Department.

The circuit court ordered that the goal be reunification with a fit parent. Anna was granted unsupervised visitation, and James was granted supervised visitation with DHS being afforded the discretion to expand his visitation to unsupervised. Appellants appealed this order, and we affirmed. *Mayer v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 365, 674 S.W.3d 748.

On December 20, 2022, the circuit court held a review hearing, and an order was filed on February 7, 2023. The circuit court ordered that the case plan goal remain

3

reunification and that the children remain in DHS's custody. The court found appellants in minimal compliance with the case plan and ordered that they attend the case plan staffing; comply with parenting classes, PPP or SafeCare services, and individual and couples counseling; obtain and maintain stable and appropriate housing and employment; and regularly visit and exhibit appropriate parenting skills. The circuit court further ordered the parents to be civil with DHS and follow the rules of visitation. It found James's combative, uncooperative, and hostile behavior during visitation unacceptable. James was ordered to be pleasant, civil, and courteous and refrain from cursing in front of the children.

James filed multiple pro se motions, including a motion to dismiss and a motion for trial home placement, which ultimately were denied. In its March 24, 2023, order, the circuit court advised appellants to cooperate with DHS.

On May 9, 2023, the circuit court held another review hearing, and an order was filed on June 16, 2023, in which it continued the goal of reunification. The court found that the parents had only minimally complied with the case plan and made minimal progress toward rehabilitating the home. The court found that appellants were unwilling to schedule family-counseling visits despite attempts by DHS and the therapists to set them. Therefore, the circuit court ordered appellants to schedule appointments with the therapists to participate in family counseling; obtain and maintain stable and appropriate housing and employment; and regularly visit and exhibit appropriate parenting skills. The circuit court further ordered the parents to develop a plan for transportation for the children and to follow the rules of visitation provided by DHS.

On August 8, 2023, the circuit court held a permanency-planning hearing, and an order was filed on September 15, 2023. The circuit court found that the visitation plan was no longer in the best interest of the children and ordered that visitation be suspended pending the remainder of the permanency-planning hearing, which would be resumed at a later date. The circuit court, however, authorized family-therapy sessions to occur in a therapeutic setting. The hearing continued on October 10, 2023, and a subsequent order was filed on November 13, 2023. In its order, the circuit court found that visitation should continue to be suspended pending the remainder of the permanency-planning hearing, which would again be resumed at a later date. The permanency-planning hearing concluded on November 21, 2023, and an order was filed on December 28, 2023. The circuit court changed the goal of the case to adoption following termination of parental rights, and the circuit court noted the following specific findings:

> Anna Mayer . . . was ordered to complete sixteen hours of in person parenting classes, to participate in Triple P parenting and SafeCare in the home, to participate in family counseling and apply the skills she learned in family visitation, to actively participate in visitation, individual therapy, couples counseling, a psychological evaluation, anger management in her counseling sessions, and to maintain daily stability. . . . James Mayer was also to complete sixteen hours of in person parenting classes, to participate in Triple P parenting and SafeCare in the home, to engage in family counseling and apply the skills learned in family visitation, to attend family visitation, to provide appropriate nurture for the children, to participate in individual counseling, to obtain a psychological evaluation, engage in couples counseling, and work on anger management in sessions. . . .Today . . . [,] [t]hey both still have felony charges related to the abuse and failure to protect. James Mayer has received new criminal charges since the case began. He has employment, but no longer has a driver's license. Anna Mayer still does not have a driver's license. The parents did complete sixteen hours of parenting classes and did individual counseling. . . . A big issue in the case has been the discord between the parents and the Department. The court has found on more than one occasion and continues to find that while the parents have availed

5

themselves of some services, they have not benefited from those services. The Court believes that they love their children and have realized that physical discipline is not appropriate. However, the parents must properly discipline and guide children to help them become functional adults and these parents are seriously lacking in that regard. The parents have not been able to demonstrate in supervised visitations that they are able to provide a safe, secure, and stable environment for the children. The case plan has required family counseling from the beginning. This has been a point of great resistance from the parents. Ms. Mayer objects because she wants to record the sessions. The therapist did not allow the sessions to be recorded and this issue was definitive for Ms. Mayer. She refused to attend the sessions. Mr. Mayer has never attempted to attend family counseling. The therapist for the boys testified that both boys have struggled in their sessions with emotional regulation and have sought safety and control. They were resistant to games and healthy play. The CASA volunteer testifies today that the boys have improved and are more regulated and controlled since the visits with the parents have stopped. Family counseling has not proceeded because the parents object to the therapists provided by DHS and have objected because the therapist will not allow recording of the therapy sessions. There is nothing to suggest to the court that the current therapists are inappropriate. The Court finds that Ms. Mayer's refusal to participate with these therapists is not justified. The Court finds this issue indicative of the fact that the parents put the power struggle with DHS above the needs of their children. The Court finds that the parents lack the capacity to empathize with their children. It is clear from the video admitted into evidence by the Mayers that once James Mayer and the DHS agent started to argue, it was distressful to the children and one of them hid under a table. The Court finds that there is no need for the parents to lose their emotional regulation so that it negatively impacts the children. It is the parental responsibility to neutralize and make it right for the children, regardless of the circumstances. The behaviors in the video were not indicative of empathy with the children. Visits are not the time, space, or way to resolve the conflict. The most important thing is to make the time with the children pleasant and productive. James Mayer was unable to comprehend how his behavior impacted the children, even today. This case is not about one instance of James Mayer physically bruising a child. The issue that needs to be addressed is whether the parents have the capacity or willingness to provide appropriate discipline and guidance so the children learn and grow and become functional adults. The parents have been unable to take instruction or guidance from professionals and unable to sincerely invest and commit themselves to learn how to do things differently. For these reasons, custody cannot be returned to the parents today. There have been no visits for months and no ability to progress to unsupervised visits. The Court has provided an avenue to have meaningful contact with the children through family counseling. The parents have refused in large part due to the inability to record the sessions, proving that the power struggle with the

6

Department is more important than seeing the children. The Court finds that it is not reasonable to expect that the children could be returned within a reasonable amount of time. The parents will not engage in the necessary services unless they are able to call the shots. There has been no significant and measurable progress towards remedying the conditions that caused removal nor towards the goal of reunification established in the case plan and the Court, therefore, changes the permanency goal to adoption following a termination of parental rights.

The circuit court again ordered appellants to comply with the case plan and orders of the court. Appellants were ordered to start meeting with the therapists, and the circuit court held that there shall be no audio or video recording of the counseling or therapy sessions.

DHS filed a petition for termination of parental rights on January 18, 2024, alleging several grounds for termination against appellants under Arkansas Code Annotated section 9-27-341(b)(3)(B) (Supp. 2023), including the failure-to-remedy, other-subsequent-factors, and aggravated-circumstances grounds. A termination hearing was held on February 26, 2024.

At the termination hearing, multiple documents, including pleadings from the case, were admitted without objection. Dr. Martin Faitak, who was qualified as an expert in clinical psychology, testified that he conducts psychological evaluations for DHS and conducted an evaluation for James and Anna. He gave Anna a verbal test because Anna said that she had "low reading abilities." The test he typically would have used required a fourth-grade reading level. Dr. Faitak testified that he diagnosed Anna with paranoid personality disorder. He explained that the criterion for the disorder is a "pervasive distrust and suspiciousness of others." He noted that Anna "expressed a lot of ill will toward DHS" and that she denied there was any kind of abuse of the children. Dr. Faitak did not have a

7

diagnosis for James. However, he said that James's responses showed "possible problems with attention, moodiness, anger, external stress and frustration tolerance." James felt little need for any changes in his behavior. Dr. Faitak noted that James's strength was his willingness to work for his family. James's evaluation was admitted into evidence without objection. During cross-examination, Dr. Faitak testified that he thought appellants' level of distrust of DHS was out of the ordinary—what he "noticed was the level of distrust and – and the lack of any change in the course of the two-hour evaluation."

Kate Davis testified that she is a therapist and sees parents and children as part of her contract with DHS. She was referred to provide services to MC3 and had discussed involving appellants in her therapy. Ms. Davis explained that she was unable to have any therapy sessions with MC3 and either of appellants together since the last court hearing. She did attempt one telehealth session with Anna individually after Anna reached out to her following the last court hearing. However, Ms. Davis was not able to have the session once Anna told her she was no longer in Arkansas, since Ms. Davis was not licensed in any other state. On cross-examination, Ms. Davis admitted that Anna had attended one in-person therapy session earlier in the case before visitation had been suspended.

Kaelyn Betz testified that she is MC1 and MC2's therapist. She explained that she has mainly had individual sessions with MC1 and MC2 and had only one family session with the foster parents. Ms. Betz testified that she had not had any contact with Anna or James. She opined that MC1 and MC2 were progressing in their therapy and had "less emotional volatility and more stability[.]" When DHS asked Ms. Betz whether her office had

reached out to appellants, Ms. Betz said that she was not aware of reception doing so. She explained that the notes she saw said that the family was responsible for scheduling any sessions.

Tyler Atkinson testified that he is a therapist and had been contacted by appellants to arrange family therapy. He met with appellants for an initial intake on October 30, 2023. After that meeting, he had a meeting with DHS to discuss coordinating with the children's therapists; however, nothing was ever set up.

The foster parent, identified at the hearing only by the name Agent, testified that he had served as the children's "foster dad" since March 2023. He explained that the children had initially struggled with boundaries and playing. However, their behavior had since improved, and they were calmer. Mr. Agent testified that the children would be very upset after visitations with appellants and that the children's behavior had become more settled since visitations were suspended. He further testified that he and his wife would consider adopting the children if parental rights were terminated.

Hayley Miles, the DHS caseworker assigned to the case, testified as to the case history as already outlined herein. Ms. Miles testified that appellants did complete counseling and their psychological evaluations. Anna had a few unsupervised visitations with the children early in the case; however, because Anna subsequently invited James to attend her visitations, all visitations thereafter were supervised because of James's attendance. There had been no attempts at trial home placement, and the visitations were suspended in August 2023. Ms.

Miles testified that she encouraged appellants to attend family therapy as directed by the court.

Ms. Miles opined that she did not believe appellants had benefited from the services of the case plan or that they had demonstrated they were able to put the parenting skills they learned to work in this case. Anna had only briefly worked during the pendency of the case and relied on James to support her. James had been employed by J.B. Hunt where he was earning approximately $80,000 a year. However, he was no longer working there and had only briefly worked at Golden Corral and McDonald's. Ms. Miles said that neither Anna nor James had provided her any documentation of current employment. Anna did not have a driver's license. Ms. Miles explained that James and Anna had reported that they moved to Alabama in January 2024. She did not think either parent had remedied the circumstances that led to the children's removal, and she did not think there were any additional services that could be offered that would result in successful reunification. She had concerns about the children's health and safety and the potential harm to them if they were returned to either parent.

Ms. Miles further testified that neither parent had addressed MC1's abuse. Ms. Miles explained that a "big piece of family therapy is taking accountability and working on healing and that has not happened in this case." Moreover, both parents had unresolved criminal matters. Ms. Miles explained that, despite significant efforts, she was unable to identify any appropriate family placement for the children. Accordingly, she thought termination of

10

parental rights and adoption was in the children's best interest since she believes the children are adoptable.

After DHS rested, Anna testified on her own behalf. Anna testified that she and James had moved to Phoenix City, Alabama, at the end of January 2024. She said that they had signed a one-year lease and had already paid six months' rent. She was working at Burger King. Regarding therapy, Anna admitted that she had not been able to schedule therapy with the children from August to November 2023. She complained that there had been transportation issues and that she did not know what she was "supposed to do in therapy if [she was] not allowed to talk about anything with [her] children." Anna testified that she had found a therapist, Mr. Atkinson, who would work around their schedules, but DHS did not respond back to start therapy with him or any of the other therapists. She said she would have come back to Arkansas for the therapy sessions.

Anna admitted that she had not remedied the pending criminal charges against her; however, she explained that she did not have any control over her cases being continued. Anna expected a resolution of her criminal cases in April 2024. Anna also admitted that she intended to live permanently in Alabama with James and that she did not have a driver's license. She explained that she did not want a driver's license due to her anxiety issues. Anna agreed that her only source of current income came from her and James's employment and that they both made only ten dollars an hour at their current jobs. She did, however, state that she had some of her $35,000 settlement left after using it to move to Alabama.

11

Anna denied that James had abused MC1 and claimed that the abuse allegation was a lie that had been presented to the court.

James testified that he and Anna moved to Alabama on January 17, 2024. He explained that he had paid five months' rent on their new home. He was currently working at Burger King but explained that he was supposed to start working at Walmart in another week. James testified that he had provided some coats, underwear, and shoes for the children but stated that some of the items were returned to him. When asked whether he would return to Arkansas to do family therapy, James responded that he "would like to feel safe with my daughter that I choose to do it with." James admitted that he had not resolved his criminal issues, including new charges, but also stated that he had no control over their scheduling. That said, James testified that he has an Alabama CDL license and has transportation. He estimated that they had approximately $10,000 remaining from Anna's settlement. He denied having abused MC1 and stated that the court was wrong in its previous determination. James asked that he be afforded more time to resolve his issues before terminating his parental rights.

Sally Neesmith, the CASA volunteer, testified that MC1 and MC2 struggled with "self-regulation" at the beginning of the case. She explained that she saw MC2 have frequent meltdowns. Ms. Neesmith testified that during one parent visit, she saw James and Anna wear cameras. She thought James was "less engaged" in the visit. She agreed that she did not have much direct communication with appellants but attributed that to the fact that

12

appellants seemed "somewhat hostile." She recommended that parental rights be terminated and opined that the children were thriving in their placement.

The circuit court filed an order terminating appellants' parental rights on April 9, 2024. In a very lengthy and detailed order, the circuit court specifically found by clear and convincing evidence that all grounds alleged in the petition supported termination and that it is in the best interest of the children to terminate appellants' parental rights. The circuit court made the following specific findings after outlining some of the relevant case history:

10. The Court finds the following facts to be true by clear and convincing evidence:

. . . .

Today, the Court finds that the parents have not in fact done everything in the case plan as they have continued to refuse to participate in family therapy with the juveniles and have failed to take steps to complete family counseling. Part of the case plan was for the parents to participate in Triple P and Safe Care programs, both of which would require the juveniles to be back in the home. The parents have not even completed family counseling, which was a critical step that had to occur before Triple P and Safe Care could get off the ground.

The Court finds by clear and convincing evidence that despite the efforts made by the Department to rehabilitate the conditions that caused removal, those conditions have not been remedied.

The Court finds the testimony of Dr. Martin Faitak to be very credible. Dr. Faitak conducted the psychological evaluations on James and Anna Mayer. Dr. Faitak diagnosed Anna Mayer with paranoid personality disorder. He described her as tense, distrusting, defensive, and irritable. Dr. Faitak testified that Anna Mayer saw herself as a victim who is misunderstood. Dr. Faitak recommended in his evaluation that Ms. Mayer participate in individual therapy in order to improve her stress management and trust for others. He recommended that she seek employment or volunteer work in order to increase her social comfort and self esteem. The Court finds that Anna and James Mayer did participate in individual therapy, but largely focused on the dispute between the parents and

13

the Department of Human Services. The parents never got to the real issues that resulted in removal of the children in their therapy sessions.

Dr. Faitak also performed a psychological evaluation on James Mayer. Test results indicated a strong positive bias by Mr. Mayer. He denied any of the usual problems that people might encounter. He appeared in his evaluation to be distrusting, dominant, and moody. He appeared to view himself as a victim of false allegations. The Court found that abuse occurred in this case at the hands of James Mayer and those findings were upheld by the Arkansas Court of Appeals. James Mayer continues to assert that he is a victim of false allegations, in this matter and in every other case against him, including his pending felony charges and the charges he incurred when stopped by the Tontitown Police.

The Court finds by clear and convincing evidence that although the Department has provided services in an attempt to remedy the conditions that caused removal, Anna and James Mayer have not availed themselves of the numerous services, including visitation, individual counseling, and family counseling in a way that would allow the safe return of the juveniles to their custody. There has been no change in the conditions that resulted in removal of the juveniles.

The Department has also proven by clear and convincing evidence that additional factors have arisen since the original petition for dependency neglect was filed in this matter that demonstrate that placement of the juveniles in the custody of the parents is contrary to the juveniles' health, safety and welfare and that despite the offer of extensive family services, the parents have not remedied the subsequent issues. Thus, those issues prevent the safe return of the juveniles to the home of the parents. Neither James nor Anna Mayer have remedied their pending criminal charges. Both are still facing felony charges for the incidents that brought the children into the Department's custody and have trials set in those cases in the Spring. James Mayer has incurred new criminal charges, including fictitious tags, refusal to submit to arrest, obstructing governmental operations, driving left of center, speeding, and possession of drug paraphernalia. In James Mayer's psychological evaluation, Dr. Faitak noted his strengths in stability and employment. Since that time, he has given up a lucrative job at J.B. Hunt and now is employed for $10 an hour. He has also moved from the State of Arkansas and has been in his current residence for one month. James Mayer has not had stable employment within the past six months, having worked for Golden Corral and McDonald's for short periods of time.

Anna Mayer has also had a change in her position and status. In her psychological evaluation, Dr. Faitak noted her steady relationship with James

14

Mayer and her stability in housing. She had lived in the same residence throughout the case, but now is no longer stable in housing and has moved out of the State of Arkansas to a residence where she has lived for one month. Based on the exhibits admitted into evidence, the Mayers have a combined income of $800 if they work forty hours per week. The lease amount of their lot for their home is $425. The carport rental is $100. The mobile home rental is $470 and there is a trash fee of $25. The total cost for housing per month is $1020 and that does not include transportation, food, and utilities. The monthly income of $800 is not sufficient to sustain the housing they currently have. Further, the Mayers received a settlement of $35,000 and only have $10,000 remaining of that settlement. Their current housing situation is not sustainable. The original circumstances that resulted in removal have not been remedied and additional factors have arisen preventing the return of the custody of the juveniles to Anna Mayer and James Mayer. Finally, there is little likelihood that additional services to James and Anna Mayer would result in successful reunification since the children have been in the custody of the Department for more than a year and the parents have not remedied the conditions that caused removal, even with the offer of extra services.

The Department has proven its grounds for termination of parental rights by clear and convincing evidence with regards to both Anna Mayer and James Mayer.

11. The Court also finds that the evidence proves the termination of parental rights is in the best interest of the juveniles. In making this finding, the circuit court considers all relevant factors, including the likelihood that the juvenile would be adopted if the parental rights were terminated, and the potential harm, specifically addressing the effect on the health and safety of the juvenile, that could be caused by returning the juvenile to the parent.

   A. As to the juvenile adoptability, the court finds that the juveniles [MC1], [MC2], and [MC3] are adoptable. The testimony of the family service worker is that the juveniles have no significant problems or barriers to adoption. The placement provider testified that he and his wife are willing to be considered for adoption if parental rights are terminated. The juveniles have maintained their placement together in a foster home for a year. Much has been made of the multiple placements, but several were emergency placements in the very beginning of the case. One move was to place the children with family members, which failed due to the health of that family member. The juveniles have demonstrated that they can maintain their placement and a prospective adoptive home has been

15

found.  The credible testimony is that the behaviors of the juveniles have improved, that they are calmer, more regulated, and one is a "rule follower."  The juveniles are thriving in their current circumstances.  The children have no significant barriers to adoption and the Court finds that the juveniles are adoptable.

B.  As to potential harm, the court finds that the juveniles would be subjected to potential harm if returned or placed with Anna Mayer or James Mayer based on the facts above. Further, the Court finds that there would be potential harm in returning the juveniles to Anna Mayer and James Mayer when the parents have still not demonstrated parenting skills sufficient to operate within the confines of the community, to follow rules, regulate their behaviors, and follow the laws.  The uncontroverted testimony is that the parents are unable to self regulate their behavior and to follow the rules.  The parents are unable to guide their children.  Anna Mayer and James Mayer have been unable to demonstrate parenting skills that would prevent them from continuing to be abusive in the future.

This appeal followed.

## II. *Standard of Review*

A circuit court's order terminating parental rights must be based on findings proved by clear and convincing evidence.  Ark. Code Ann. § 9-27-341(b)(3).  Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established.  *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007).  On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous.  *Id.*  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.  *Id.*  In determining whether a

16

finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Reid v. Ark. Dep't of Hum. Servs.*, 2011 Ark. 187, 380 S.W.3d 918.

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Cobb v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 85, 512 S.W.3d 694. Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Id.* Finally, a parent's past behavior is often a good indicator of future behavior. *Id.*

17

### III. *Termination*

In dependency-neglect cases, if, after studying the record and researching the law, appellant's counsel determines that the appellant has no meritorious basis for appeal, then counsel may file a no-merit brief and move to withdraw. Ark. Sup. Ct. R. 6-9(j)(1) (2023). The brief must include an argument section that lists all adverse rulings that the parent received at the circuit court level and explain why each adverse ruling is not a meritorious ground for reversal. Ark. Sup. Ct. R. 6-9(j)(1)(A). The brief must also include a statement of the case and the facts containing all rulings adverse to the appellant made by the circuit court at the hearing from which the order of appeal arose. Ark. Sup. Ct. R. 6-9(j)(1)(B). Separate counsel for Anna and James have each filed a no-merit brief.

Counsel for Anna and James correctly assert that there can be no meritorious challenge to the sufficiency of the evidence supporting the termination of appellants' parental rights. Although the circuit court found multiple statutory grounds for termination, only one ground is necessary to support the termination. *See Campbell v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 82. The circuit court found by clear and convincing evidence that DHS had proved the aggravated-circumstances ground. Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)*(a)* lists as a ground for removal when

> (ix)*(a)* The parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to:
>
> . . . .
>
> *(3)(A)* Have subjected any juvenile to aggravated circumstances.

*(B)* "Aggravated circumstances" means:

*(i)* A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is *little likelihood that services to the family will result in successful reunification*;

(Emphasis added.) This type of aggravated circumstance occurs when a parent is not following through with offers of assistance, is not completing basic goals of the case plan, and is not making significant progress. *Jones v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 299, 578 S.W.3d 312.

Sufficient evidence supports the circuit court's finding of aggravated circumstances in this case. A parent's continued inability to protect and care for his or her child and failure to benefit from the services provided demonstrate little likelihood that further services will result in a successful reunification. *Id.* This case had been open since 2022, and there had been no attempts at trial home placement. Further, neither parent would even acknowledge or take accountability for James's abuse of MC1, which necessitated the children's removal from appellants' custody. Instead, visitations eventually had to be suspended in August 2023 due to appellants' behaviors. Nevertheless, the circuit court offered appellants a path to see their children in a therapeutic setting even after visitation had been suspended. However, neither appellant completed the family therapy as ordered by the circuit court, despite DHS offering such services. Rather, appellants moved out of state, making it even more difficult for them to take advantage of the services DHS offered. Although James and Anna testified that they would be willing to drive back to Arkansas to attend family therapy if given another opportunity and blamed DHS for their inability to previously do so, the circuit court was

19

not required to believe their self-serving testimony that they would follow through and achieve the stability needed if they were granted additional time. Further, Ms. Miles testified that there were no additional services that could be offered that would result in successful reunification. Given these facts, the aggravated-circumstances ground supported termination of appellants' parental rights, and any argument to the contrary would be without merit. Because we conclude that DHS adequately proved the aggravated-circumstances ground, we need not discuss the remaining grounds found by the circuit court. *See Kohlman v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 164, 544 S.W.3d 595.

Both James's and Anna's counsel further assert that there can be no meritorious challenge to the circuit court's finding that termination was in the children's best interest, and we agree. Ms. Miles testified that the children are adoptable, and this court has made it clear that a caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Krecker v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 537, 530 S.W.3d 393.

In assessing the potential-harm factor, the court is not required to find that actual harm would ensue if the child were returned to the parent nor to affirmatively identify a potential harm. *Sharks v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 435, 502 S.W.3d 569. The potential-harm analysis is to be conducted in broad terms. *Id.* Past actions of a parent over a meaningful period of time are good indicators of what the future may hold. *Id.* Here, the circuit court found that "Anna Mayer and James Mayer have been unable to demonstrate parenting skills that would prevent them from continuing to be abusive in the future."

Appellants' behaviors over the course of the entire case as outlined above do not show enough stability to render the circuit court's finding that they posed a risk of potential harm to the children clearly erroneous. On this record, the circuit court's finding that termination of appellants' parental rights was in the children's best interest was not clearly erroneous, and we agree that any argument to the contrary would be without merit.

## IV. *Other Adverse Rulings*

Both James's and Anna's counsel correctly note that there were numerous adverse rulings; however, none of the rulings would present meritorious grounds for reversal. We will not reverse a circuit court's ruling on admissibility of evidence absent a manifest abuse of discretion. *Barton v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 239, 576 S.W.3d 59; *Day v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 411, 653 S.W.3d 812. A mere showing that the circuit court erroneously admitted evidence will not support a reversal absent a showing of prejudice. *Barton*, *supra*. Without any showing of prejudice, any judicial error as to the admissibility of evidence is harmless error and cannot be grounds for disturbing a circuit court's order. *Id.*

Here, many of the adverse rulings outlined by counsel involved evidence that was already part of the circuit court's record or was cumulative of other evidence that was admitted without objection at the termination hearing and therefore cannot be reversible error. *See Barton*, *supra*. For many of the other objections identified by counsel, we agree with counsel that the rulings were correct and that it cannot be said that the circuit court abused its discretion. Moreover, we have held that when an adverse ruling could not have

21

changed the outcome of the proceeding and resulted in no prejudice, there can be no meritorious challenge to the adverse ruling. *Day*, *supra*. Here, even if there was an error with the adverse rulings identified by counsel, the error would nevertheless be harmless in light of the other evidence presented supporting termination of appellants' parental rights as already discussed above.

Finally, we note that both James's and Anna's counsel overlooked and failed to identify additional rulings that were adverse and should have been included in their no-merit briefs. Although counsel failed to address why these adverse rulings do not present meritorious grounds for reversal, a counsel's failure to address every adverse ruling does not automatically require rebriefing. *See Sartin v. State*, 2010 Ark. 16, at 1, 362 S.W.3d 877, 878 (holding that the failure to list and discuss all adverse rulings in a no-merit termination-of-parental-rights case does not automatically require rebriefing if the ruling would clearly not present a meritorious ground for reversal); *see also Houseman v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 227, 491 S.W.3d 153 (affirming termination of parental rights by addressing a statutory ground that was omitted from counsel's brief). Here, we conclude that none of these evidentiary rulings amounted to an abuse of discretion, and any possible error did not affect the outcome of the proceedings. *Brown v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 303, 521 S.W.3d 183. Accordingly, because the adverse rulings omitted do not present meritorious grounds for reversal, we will not require rebriefing. *Id.*

Thus, having carefully examined the record and the briefs presented to us, we find that each counsel has complied with the requirements established by the Arkansas Supreme

Court for no-merit appeals in termination cases, and we conclude that the appeal is wholly without merit. Accordingly, we affirm the order terminating appellants' parental rights and grant each counsel's motion to withdraw.

Affirmed; motions to withdraw granted.

BARRETT and MURPHY, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for separate appellant Anna Mayer.

*Streit Law Firm, PLLC*, by: *Jonathan R. Streit*, for separate appellant James L. Mayer.