Cite as 2026 Ark. App. 262

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-25-726

| | |
|---|---|
| MAI HTOO | Opinion Delivered April 29, 2026 |
| APPELLANT | |
| | APPEAL FROM THE JOHNSON COUNTY CIRCUIT COURT |
| V. | [NO. 36JV-24-44] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE KEN D. COKER, JR., JUDGE |
| APPELLEES | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Appellant, Mai Htoo ("Htoo"), appeals the Johnson County Circuit Court's order terminating her parental rights to her children, Minor Child 1 ("MC1") (DOB 10/25/13), Minor Child 2 ("MC2") (DOB 11/13/17), Minor Child 3 ("MC3") (DOB 08/26/20), and Minor Child 4 ("MC4") (DOB 11/28/21).[1] On appeal, Htoo argues that the circuit court erred in finding sufficient evidence to support the statutory grounds for termination. We affirm.

An Arkansas Department of Human Services (DHS) family service worker attested that on April 24, 2024, DHS received a report from the children's grandparent that Htoo

---

[1]MC1, MC2, MC3, and MC4 share the same mother but have different fathers. Neither father is a party to this appeal.

left the house with MC2 while wearing no shoes, had taken pills, and was "talking crazy." DHS workers responded to the house and later located Htoo and MC2 in a bank parking lot with police officers who had been called by the bank employees. Htoo stated that she was trying to walk to her car that was broken down, and if she was able to start her car, it would "save the whole world." She also told the DHS worker that she was a queen who controlled everything. Officers transported Htoo and MC2 back home. Htoo agreed to an alcohol swab, which was negative, but she refused to take a drug screen. Htoo continued to act erratic, yelling at MC1 and pushing her aside.

On April 26, 2024, Htoo submitted to a drug screen and tested positive for methamphetamine, amphetamines, and THC. DHS implemented a safety plan placing the children with their grandparents and restricting Htoo's access to them.

On May 1, DHS filed a petition for ex parte emergency order for protection of juvenile from immediate danger regarding the children in the Johnson County Circuit Court. After MC1 reported to her teacher via Facebook that she and her siblings were hiding in a closet because Htoo was intoxicated and they were scared, DHS exercised a seventy-two-hour hold on the children.

On May 3, DHS filed a petition for emergency custody and dependency-neglect, and the circuit court granted DHS's request for emergency custody that same day. The circuit court's ex parte order for emergency custody found there was probable cause that the children were dependent-neglected, and they were ordered to be immediately removed from the custody of Htoo and placed into the custody of DHS.

On May 7, the circuit court held a probable-cause hearing and found there was probable cause in that the emergency conditions that necessitated removal of the children from the custody of Htoo continued, it was contrary to the children's welfare to be returned home, and it was necessary for them to continue in the custody of DHS. The circuit court ordered Htoo to submit to random drug screens, obtain and maintain stable and appropriate housing, participate in counseling and a psychological evaluation, submit to a drug-and-alcohol assessment, and complete and follow any recommendations.

On June 18, 2024, the circuit court held an adjudication hearing and found by a preponderance of the evidence that the children were dependent-neglected because they were at substantial risk of serious harm due to neglect because of substance abuse. The circuit court further found that Htoo stipulated that had DHS presented its evidence, it would have proved by a preponderance of the evidence that the children were dependent-neglected and were at substantial risk of serious harm due to neglect because of substance abuse.

On October 1, 2024, the circuit court held a review hearing. At the hearing, the circuit court continued the goal of reunification and found that DHS had made reasonable efforts towards that goal by providing services. The court further found Htoo minimally compliant with the case plan and ordered compliance with all previously ordered services.

On November 22, 2024, DHS filed a motion to terminate reunification services and notice of hearing alleging that the children's parents have subjected the children to aggravated circumstances in that there is little likelihood that services to the family will result in successful reunification between the parents and the children.

On December 4, 2024, DHS and MC4's attorney ad litem filed an ex parte motion to modify visitation requesting that MC4's visitation with Htoo be suspended because MC4 displayed troubling behaviors following his visitation with Htoo, including night terrors, bed wetting, and hitting and kicking his teachers and classmates. That same day, the circuit court entered an ex parte order to modify visitation and suspended Htoo's visitation with MC4.

Following a hearing on February 18, 2025, the circuit court granted DHS's motion to terminate reunification services. The circuit court also found that DHS had made reasonable efforts to provide family services.

At the permanency-planning hearing on March 31, 2025, the circuit court changed the goal of the case to adoption, again finding that DHS had made reasonable efforts in the case.

On April 30, 2025, DHS filed a petition for termination of parental rights alleging subsequent factors as one of the grounds for termination. DHS also referenced the failure-to-remedy ground but did not cite any specific statute and included language that did not track the statute.

A termination hearing was held on July 15 and July 29, 2025. Leigh Maxwell ("Maxwell"), a mental-health therapist for MC3 and MC4, testified that she began seeing MC3 in June 2024 and MC4 in March 2025. MC3 was diagnosed with adjustment disorder with mixed disturbance of emotions and conduct; separation anxiety disorder; possible attention deficit hyperactivity disorder with combined presentation, and child neglect confirmed initial encounter; MC4 was diagnosed with an unspecified adjustment disorder.

4

Maxwell further testified that MC3 exhibited aggression associated with Htoo's name or photograph and emphasized the children's need for stability and an environment where they are safe, accepted, and loved. She stated that MC3 had improved in treatment and in her current placement. Maxwell also observed a strong bond between MC4 and the current placement and opined that a change in circumstances could negatively impact him.

Brittany Land, the mental-health therapist for MC1 and MC2, testified that she began treating MC2 in July 2024 and MC1 in December 2024. MC2 was diagnosed with posttraumatic stress disorder; attention deficit hyperactivity disorder; and child neglect and initially presented as guarded, struggling to speak in full sentences, and clingy. Due to MC2's reactions when Htoo was discussed in therapy and reports from the foster family about his behavior when visitation was mentioned, Land recommended that visitation with Htoo cease.

Land testified that MC2 made progress in treatment: he had improved communication, he no longer speaks in the third person, and he is better at expressing his emotions and needs. After visitation stopped, MC2 appeared less fearful and more at ease. She further opined that returning a child to the environment where abuse occurred risks detriment to the child's mental health and potential retraumatization.

Land testified that MC1 was diagnosed with posttraumatic stress disorder. She did not believe that visitation would be detrimental to MC1 and stated that the current placement for MC1 and MC2 was a good placement for them. She also noted that MC2 was being evaluated for autism.

Jillian Ison, a qualified behavioral-health provider, testified that she works closely with the children doing behavior interventions and sees them weekly, sometimes twice weekly. She stated that the children are happy in their current placement and would regress if returned to their biological parents. She further stated that it is not in the children's best interest to be with their biological parents, and it would be in the children's best interest to have comfort, structure, and stability.

Ashley Dossett, Johnson County Division of Children and Family Services supervisor, testified that she had overseen the case since May 2024 and the children had remained out of Htoo's custody with no trial home placements. Although Htoo did not participate in the case plan for the first six months, she became active after she got married and DHS located her. Visitation began in November 2024 but was later suspended for MC2, MC3, and MC4 at the therapists' recommendations and ultimately ended for MC1 after the February hearing.

Dossett testified that she met with Htoo only twice between February 2025 and the termination hearing. She stated that Htoo had obtained an apartment and was living with her boyfriend, but the housing was unsuitable due to limited space and lack of belongings for the children, and only two children were listed on the lease. After the February hearing, Htoo sought employment assistance and was referred to the nonprofit 100 Families. She further testified that returning the children to Htoo's custody would not be in their best interest, their current placements are interested in adoption, and the children are adoptable.

She also testified that the children would be at risk of danger if placed in either parent's custody and that they had been removed by DHS three times since 2022.

DHS rested, and Htoo testified on her own behalf. She stated that DHS provided her with a list of requirements to regain custody, including counseling, employment, housing, and random drug screens, and she acknowledged that DHS conducted urine screens. She admitted she did not participate in any drug or alcohol treatment but stated that she stopped drinking alcohol a year earlier. She also completed parenting classes, had been employed for three months, and moved into her apartment in May 2025. She also participated in services through Safe Haven, which focused on parenting and communication skills.

On August 28, 2025, the circuit court entered an order terminating Htoo's parental rights, finding that termination was in the best interest of MC1, MC2, MC3, and MC4, and the statutory grounds of subsequent factors and aggravated circumstances were proved. The circuit court noted that DHS attempted to plead the failure-to-remedy ground under Arkansas Code Annotated section 9-27-341 but found that this ground was not properly alleged in the petition to terminate and therefore was not a valid basis for termination.

This court reviews termination-of-parental-rights cases de novo. *Huggler v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 379, at 12, 715 S.W.3d 921, 928. An order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2023).[2] Clear and convincing evidence is defined as that

---

[2]Act 518 of 2025 repealed the Juvenile Code. Former Ark. Code Ann. § 9-27-341 governed this issue at the time. Its provisions are now codified at Ark. Code Ann. § 9-35-

degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Mayer v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 51, at 16. When the burden of proving a disputed fact is by clear and convincing evidence, the appellate inquiry is whether the circuit court's finding is clearly erroneous. *McGaugh v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 485, 505 S.W.3d 227. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Huggler*, 2025 Ark. App. 379, at 12, 715 S.W.3d at 928. In resolving the clearly erroneous question, we defer to the circuit court because of its superior opportunity to observe the parties and judge the credibility of the witnesses. *Id.* at 12–13.

To terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. *See* Ark. Code Ann. § 9-27-341(b)(3). The circuit court must also find by clear and convincing evidence that one or more statutory grounds for termination exist. *Id.* Proof of only one statutory ground is sufficient to terminate parental rights. *See Barnes v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 559, at 13, 725 S.W.3d 848, 855.

---

325 (Supp. 2025). When the order on appeal was entered, the current legislative change was not in effect. Therefore, the previous version of the Code is relied on in this case.

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. *See Mayer*, 2025 Ark. App. 51, at 17; Ark. Code Ann. § 9–27–341(a)(3). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Mayer*, 2025 Ark. App. 51, at 17 (citing *Cobb v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 85, 512 S.W.3d 694). A child's need for permanency and stability may outweigh a parent's request for additional time to improve circumstances, and a parent's past behavior is often an indicator of future behavior. *See id.*

On appeal, Htoo challenges two statutory grounds––failure to remedy and subsequent factors. However, as stated above, the circuit court terminated Htoo's parental rights on the grounds of subsequent factors and aggravated circumstances. The subsequent-factors ground, as set forth in Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)*(a)*, permits termination when

> other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

Htoo argues that there was insufficient evidence to support termination based on the subsequent-factors ground, asserting that DHS failed to offer appropriate family services to

9

her. Htoo does not challenge the circuit court's best-interest finding; therefore, we need not address it. *See, e.g., Yarbrough v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 429, at 7, 501 S.W.3d 839, 843 (citing *Benedict v. Ark. Dep't of Hum. Servs.*, 96 Ark. App. 395, 242 S.W.3d 305 (2006)).

Here, Htoo did not appeal from the circuit court's prior findings that DHS had made reasonable efforts, nor did she raise this issue at the termination hearing. *See id.* at 8–9. This court has repeatedly held that the failure to appeal a circuit court's prior meaningful-effort findings precludes review of those findings. *Id.* at 8. Thus, any argument that DHS failed to provide her appropriate services is waived.

Even so, the record reflects that DHS provided Htoo multiple services throughout the case, including home visits, visitation, drug screens, staffings, and referrals to services such as 100 Families. After the filing of the dependency-neglect petition, Htoo failed to engage in the case for six months and did not secure housing or employment until shortly before the termination hearing. Although Htoo eventually made progress in these areas, including sobriety, her compliance came late in the case and after a prolonged period of nonengagement.

The evidence supports the circuit court's finding that, despite the services offered, Htoo did not demonstrate the stability necessary for the children's safe return. This court has recognized that such late compliance does not outweigh a history of noncompliance, particularly in light of the children's need for permanency and stability. *See Cobb*, 2017 Ark. App. 85, 512 S.W.3d 694; *Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, at 11,

555 S.W.3d 915, 921; *Burleson v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 616, at 8, 535 S.W.3d 655, 659. Accordingly, the circuit court did not clearly err in finding that DHS proved the subsequent-factors ground.

Because only one statutory ground is necessary to support termination of parental rights, we do not address the other statutory ground found by the circuit court. Ark. Code Ann. § 9-27-341(b)(3)(B). Therefore, we affirm.

Affirmed.

TUCKER and MURPHY, JJ., agree.

*Wallace, Martin, Duke & Russell, PLLC*, by: *Valerie L. Goudie*, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services Office of Chief Counsel, for appellee.

*Linda J. Hamilton*, attorney ad litem for minor children.